**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN WICK, et al.,** | ) | **CASE NO.  1:16 CV 1835** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **GREENPOINT MORTGAGE** | ) | |
| **FUNDING, INC., et al.,** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **Defendants.** | ) | **AND ORDER** |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, GreenPoint Mortgage Funding, Inc. ("GreenPoint").  (Docket #10.)  GreenPoint seeks summary judgment as to the claims raised against it by Plaintiffs, John Wick, Shirley Wick and Leodonna Wick.

## I.    Factual Background

In September 2003, John Wick and his mother, Shirley, purchased a single-family home at 2119 Clarence Avenue in Lakewood, Ohio ("the Property"), where they would reside along with his now-wife, Leodonna Wick, and their two children.  (Docket #18, Affidavit of John Wick ("Wick Affidavit") at Paragraphs 2, 3 and 6.)  The decision to purchase a home, rather than continue renting, was precipitated by the fact that Shirley's husband had passed away; Shirley was becoming frail and needed to move in with John and his family; and, the family needed more space.  (Id.)  John (who had a credit score of 777) obtained a home loan through

Homecomings Financial in the amount of $120,000.00 and executed a mortgage in September 2003.  (Id. at Paragraph 19.)

Mr. Wick states that soon after the purchase, he received a notice from Homecomings that an error in the amount of several hundred dollars had been made in the original statement of his monthly payment, resulting in a payment increase which he could not afford.  (Id. at Paragraphs 22-25.)  Mr. Wick sought refinancing through mortgage broker James Chapman of Precision Funding.  Mr. Wick states that he explained his circumstances to Mr. Chapman and emphasized he was seeking more favorable loan terms.  (Id. at Paragraphs 26-29 and 32.)

On April 30, 2004, Mr. Wick obtained a loan from ABN AMRO, brokered by Mr. Chapman, in the amount of $129,000.00 – increasing Mr. Wick's liability by over $9,000. (Wick Affidavit at Paragraph 27.)  Mr. Wick asserts that Mr. Chapman and Precision Funding "demanded Mr. Wick's mother, Shirley Wick, also become liable on the note in order to be able to list her bank account as an asset."  (Complaint at Paragraph 45.)  (Shirley was suffering from Alzheimer's disease at the time of the transaction; her only income was Social Security; and, she had no ability to meet the requirements of the loan.  (Id. at Paragraph 46.))  Mr. Wick made all required monthly payments on the April 30, 2004 ABN AMRO Loan.

Sometime in 2005, Mr. Chapman initiated contact with Mr. Wick, encouraging him to refinance the April 30, 2004 ABN AMRO Loan, representing Mr. Wick could save hundreds of dollars through a new loan product offered by GreenPoint.  (Wick Affidavit at Paragraphs 37-41.)  At this time, Mr. Wick's credit score was between 784 and 790.  (Id. at Paragraphs 36 and 55.)  Mr. Wick asserts that Mr. Chapman aggressively marketed the loan and "represented himself as a debt counselor with specialized skills to assist [him] in improving [his] financial situation.  (Opposition Brief at p. 1; Wick Affidavit at Paragraphs 38-41.)  Mr. Wick ultimately

-2-

agreed to refinance.

The total amount of funds needed to conclude the August 2005 refinance was $134,070.98. (Wick Affidavit at Paragraph 56.) For purposes of the refinance, Precision Funding obtained an appraisal, valuing the Property at $145,000.00 – a $25,000.00 increase in a two-year period with no improvements made to the Property during that time. (Id. at Paragraph 57.) In addition to receiving a Loan from GreenPoint in the amount of $116,000.00, John and Shirley Wick also entered into a Home Equity Line of Credit Agreement ("HELOC") and Promissory Note with GreenPoint. According to GreenPoint, under the terms of the HELOC, GreenPoint agreed to extend up to $21,700.00 to John and Shirley Wick. Both the Loan and the HELOC were secured by mortgages ("First Mortgage" and "Second Mortgage"), granting GreenPoint a security interest in the Property. Defendant, Mortgage Electronic Registration Systems, Inc. ("MERS"), acted as nominee for GreenPoint.[1] (Id. at Paragraph 45.) John Wick alleges he was unaware that he had agreed to or entered into the HELOC. He believed he was entering into only one loan and mortgage with GreenPoint. (Wick Affidavit at Paragraph 49.)

Mr. Chapman and a notary came to the Wick home on August 26, 2005 and John and Shirley Wick executed the documents provided to them. Mr. Wick states as follows with regard

---

[1]

       As stated by GreenPoint, MERS is an organization that was founded to alleviate the requirement of preparing, recording and tracking the assignment of loans each time the loan servicer or investor changes. "MERS was named as the beneficiary of the Mortgage so that GreenPoint did not have the responsibility of monitoring when and to whom the loan and mortgage were assigned." (Motion for Summary Judgment at p. 6.) GreenPoint stated in its Notice of Removal that "[w]hile MERS is named as a defendant to this action, no claims remain pending against MERS" and that "[t]he only claim asserted against MERS is a quiet title claim, which is moot, because MERS disclaimed any interest in the property at issue." The Parties did not address this on summary judgment.

-3-

to the closing:

> James Chapman and a notary appeared at my home at dinner time on 8/26/2005 with several stacks of papers for me and my mother to sign.

> They stayed in my kitchen a long time engaging in distracting maneuvers including telling jokes, doing impersonations, and engaging in stalling tactics while from time to time off-handedly offering documents for signature by my mother and me; the process was long and tedious, with the distractions making it hard to concentrate.

> When I asked questions about things that I noticed that did not conform with my expectations, Mr. Chapman and the notary assured me that those provisions did not apply to me; the entire array of documents and their presentation was so confusing that I told Mr. Chapman that I could only go through with this transaction based on my trust in him to tell me the truth; and Mr. Chapman assured me that I could trust him to act in my interest and rely on his explanation of the documents and the terms of the transaction.

(Wick Affidavit at Paragraphs 46-48.)

The Parties dispute whether any documents – including the required notices regarding the Wicks' rescission rights – were left with John and Shirley Wick on August 26, 2005.  Mr. Wick states as follows:

> James Chapman and the notary did not leave any documents for my review after my mother and I had signed them; I received a large package in the mail about a week after the signing; I kept the complete set undisturbed and upon request by my attorney delivered the complete set of documents to her; these documents received by mail after the closing are the only documents I received in the Green Point Transaction.

(Wick Affidavit at Paragraph 48.)

When Mr. Wick received a bill for the HELOC, he contacted Mr. Chapman and alleges Mr. Chapman told him there was no second mortgage; that the bill was in error; and, that Mr. Wick should ignore it.  (Wick Affidavit at Paragraph 50.)  Nevertheless, Mr. Wick made payment on the HELOC "to avoid problems."  (Id.)  The following month, Mr. Wick received a second bill for the HELOC and again contacted Mr. Chapman.  Mr. Wick alleges Mr. Chapman

-4-

assured him that this was an error.  (Id. at Paragraph 51.)  Mr. Wick alleges that Mr. Chapman

asked if the combined payments on the Loan and HELOC were greater than the amount Mr.

Wick had agreed to, which they were.  (Id.)  Mr. Wick states that he told Mr. Chapman this was

not what he had agreed to and "wanted out," but that Mr. Chapman advised him to keep making

monthly the payments and he would work it out.  (Id.)  Mr. Wick was not able to reach Mr.

Chapman after this time.  (Id. at Paragraph 52.)

After paying for several months, Mr. Wick states he received a notice from GreenPoint

that his mortgage payments were going to increase.  (Id. at Paragraph 53.)  At this time, he

examined his statements more closely and realized that with each statement, the balance due on

the principal was increasing.  Mr. Wick states in his Affidavit:

> Until that time, I had never heard of a negatively amortizing loan and did not
> know that the loan I had was a negatively amortizing loan; the only reference in
> the entire transaction to the concept "negative amortize" occurred at the time that
> I signed the loan documents; this was an [sic] reference in passing in connection
> with the representation that if I had "extra money" I should use it to pay extra on
> the principal "because you do not want the loan to negatively amortize"; this,
> however was treated as optional; at no point was it explained that if I did not do
> that my principal balance would increase and my monthly payment would
> increase from $600.00/month to $1,400.00/month.

(Id. at Paragraph 54.)

The increase in payment on the Loan, along with the $150.00 monthly payment on the

HELOC, was unaffordable.  Mr. Wick retained an attorney and sought to rescind the transaction,

asserting violations of the Truth in Lending Act.  (Id. at Paragraph 58.)  As stated above, Mr.

Wick states that he gave his attorney the entire package of documents that GreenPoint had sent

to him a week after closing, which he had left undisturbed.  Mr. Wick asserts that the package

included in the hundreds of pages of documents, including multiple copies of loan documents

filled in with inconsistent loan terms.

In order to effectuate the rescission, Mr. Wick obtained a loan commitment from Third Federal for a new loan which, combined with funds available from Mr. Wick's 401k, was sufficient to fulfill his tender obligation to GreenPoint under TILA.  (Id. at Paragraphs 58 and 60.)  On September 22, 2007, John and Shirley Wick sent a Notice of Rescission to GreenPoint, and also to EMC Mortgage Corporation who sent the monthly loan statements, asserting GreenPoint had violated TILA.  (Id. at Paragraphs 58-59.)  Plaintiffs state, "The Wicks were not required to tender ahead of Greenpoint's performance, but they anticipated that Greepoint would obey the law and wanted to be sure that they could then fulfill their obligation."  (Opposition Brief at p. 4.)  GreenPoint rejected the Wicks' request to rescind, arguing no TILA violations had occurred.  (Wick Affidavit at Paragraph 60.)

At some point thereafter, the Note and Mortgage were transferred to Wells Fargo Bank, N.A.  When John could no longer make the payments, Wells Fargo filed a Foreclosure Action in State court against the Wicks, which precipitated the Wicks' claims against GreenPoint and MERS.  (Id. at Paragraph 62.)  Wells Fargo and Plaintiffs subsequently settled their claims and Wells Fargo dismissed the foreclosure action against the Wicks.  GreenPoint and MERS then removed the case to this Court.

Mr. Wick asserts he was tricked into getting loans from GreenPoint; tricked into believing he had only one mortgage and one mortgage payment; tricked as to the terms of the mortgage; and, tricked as to the amount and duration of his payments.  (Id. at Paragraph 63.)  Plaintiffs assert that Greenpoint/MERS misrepresented to Mr. Wick that this loan had a lower monthly payment that would cover principal and interest and would make available more funds to care for his family and elderly mother.  (Id. at Paragraphs 38-41.)  The only claims remaining in this case are Plaintiffs' claim against GreenPoint/MERS alleging GreenPoint violated TILA

when it rejected Plaintiffs' attempt to rescind the transaction and Plaintiffs' claim against GreenPoint alleging civil conspiracy.[2]

On September 7, 2016, GreenPoint filed its Motion for Summary Judgment (Docket #10), arguing Plaintiffs' TILA claims are barred by the statute of limitations and that Plaintiffs received all notices and disclosures required under TILA.  (Docket #10.)  With regard to Plaintiffs' civil conspiracy claim, GreenPoint argues there is no evidence that it maliciously conspired to commit an independent, unlawful act against Plaintiffs and no evidence that an independent, unlawful act was committed.  Finally, GreenPoint argues that it is entitled to summary judgment as to Leodonna Wick's claims for violations of TILA and civil conspiracy because she was not a party to the underlying loan transactions and, therefore, lacks standing.

On October 7, 2016, Plaintiffs filed their Opposition Brief.  (Docket #13.)  Plaintiffs argue that they had grounds to rescind the August 25, 2005 mortgage transaction based on GreenPoint's alleged violations of TILA during closing and that they provided a timely Notice of Rescission to GreenPoint on September 22, 2007, within three years of loan origination, thereby satisfying the requirements of TILA.  Plaintiffs state GreenPoint had 20 days under 15 U.S.C. § 1635(b) to cancel its security interest, return any money or property given to it and accept the funds tendered by the Wicks, but failed to act, in violation of TILA.  Plaintiffs state: "It is this September 22, 2007 violation of the Truth in Lending Act, specifically violation of 15 U.S.C. § 1635(b) that gives rise to the damages asserted in this lawsuit.  GreenPoint violated 1635(b) by inaction and by actively transferring the now-void security interest to Wells Fargo."

---

[2]

James Chapman and Precision Funding Corporation were never properly served with Plaintiffs' Third Party Complaint and were dismissed as Parties in State court.

Plaintiffs argue their lawsuit is timely because it was filed on April 8, 2008 – within one year of September 22, 2007, the date they attempted to rescind the transaction.

Further, Plaintiffs argue that they have presented competent, credible evidence of TILA violations and that GreenPoint, Mortgage Electronic Registration Systems, and the broker conspired to commit fraud.  Finally, Plaintiffs argue Leodonna Wick has standing because she has been injured by the alleged civil conspiracy and TILA violations.

GreenPoint filed a Reply Brief on October 21, 2016.  (Docket #24.)

**II.     Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine dispute" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine [dispute] of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a dispute is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact

-8-

because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

## III. Discussion

The Court has thoroughly reviewed the Motion for Summary Judgment filed by Plaintiffs, as well as all responsive briefing and supporting documentation, considering all of the evidence available to the Court in a light most favorable to Plaintiffs.

### A. TILA

#### 1. Leodonna Wick.

Plaintiff, Leodonna Wick, does not have standing to pursue a claim under TILA, as a spouse who was not a party to a loan or mortgage lacks the ability to bring a TILA claim. *Britt v. Flagstar Bank*, Case No. 10-14463, 2011 U.S. Dist. LEXIS 150463, at *11-12 (S.D. Mich. Oct. 27, 2011). Accordingly, GreenPoint is entitled to summary judgment on Plaintiffs' TILA claim as to Plaintiff, Leodonna Wick.

#### 2. John and Shirley Wick.

15 U.S.C. § 1635, entitled "Right of rescission as to certain transactions," provides as follows:

(a) Disclosure of obligor's right to rescind. Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title [15 USCS §§ 1601 et seq.], whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Bureau, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

(b) Return of money or property following rescission. When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.
(c) Rebuttable presumption of delivery of required disclosures. Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this title [15 USCS §§ 1601 et seq.] by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

15 U.S.C. § 1635.

15 U.S.C. § 1635(f) provides that in the event the required information, forms, or

material disclosures are not delivered to the borrower, the right of rescission expires **three years**

from the date of the transaction, not three days.  Plaintiffs argue that GreenPoint failed to clearly and conspicuously disclose, prior to John and Shirley signing the Note, that each had the right to cancel; that GreenPoint failed to deliver to each borrower, for each note, two copies for each borrower, of a form to exercise the right to rescind; and, failed to clearly and conspicuously deliver all material disclosures, as required under 15 U.S.C. § 1635(a); Reg. Z 1026.15(b), 1026.23(b).  Accordingly, Plaintiffs argue that the exercise of their rescission rights was in fact timely, as their Notice of Rescission was tendered to GreenPoint on September 22, 2007, well within three years of the transaction at issue.

GreenPoint argues that the Wicks' signatures on various agreements and disclosure forms precludes them from successfully arguing they had three years to rescind, as TILA provides that the written acknowledgment of receipt of any disclosures required under TILA creates a rebuttable presumption of delivery. 15 U.S.C. § 1635(c).  However, Plaintiffs may offer "evidence to rebut or meet the presumption." Fed. R. Evid. 301.  While no one disputes that John and Shirley Wick signed numerous documents, John and Shirley Wick allege they were rushed and lied to during the closing process; that conflicting documents were presented during closing; that Mr. Chapman instructed them to ignore certain portions of the loan documents when Mr. Wick raised concerns; and, that required material disclosures were not provided.  GreenPoint admits it was not present at loan closing, and did not communicate with the Wicks, yet stands by its assertion that all required disclosures were made and notices provided.  The Parties dispute whether any documents were left with the Wicks at closing, including the required number of copies of the notices of right to rescind, but do not dispute the Wicks received a package of hundreds of documents from GreenPoint some time after closing, nor do they dispute that

-11-

package contained documents that included inconsistent loan terms.

Under the facts and circumstances in this case, Plaintiffs have presented sufficient evidence to rebut the presumption of delivery of the disclosures required under TILA.  The question of whether the Wicks' Notice of Rescission was timely depends on whether or not GreenPoint complied with TILA's disclosure requirements, which is disputed by the Parties.  Likewise, genuine issues of material fact persist with regard to the circumstances under which the loan documents were executed; the alleged TILA violations committed at closing; and, the relationship of James Chapman/Precision Funding and Greenpoint, all of which are relevant to a determination as to whether GreenPoint violated TILA when it rejected the Wicks' attempted loan rescission.  Accordingly, GreenPoint's Motion for Summary Judgment is denied as to the TILA claim asserted by John and Shirley Wick.

### B.    Civil Conspiracy

Plaintiffs allege that GreenPoint/MERS conspired with James Chapman of Precision Funding, among others, to induce John and Shirley Wick to enter into the loan at issue, intentionally misleading them about the terms of the loan so that both GreenPoint/MERS and James Chapman would profit, and injuring the Wicks.  In response, GreenPoint argues that Plaintiffs have failed to allege malice or that GreenPoint had anything to do with the alleged misrepresentations made by James Chapman throughout the loan transaction.

Genuine issues of material fact persist as to the relationship, if any, between GreenPoint, James Chapman and Precision.  The Parties have requested an extension of the discovery deadlines previously set in this case, an indication that there may be additional information forthcoming, thereby rendering their request for summary judgment premature.  GreenPoint's

-12-

request for summary judgment as to Plaintiffs' civil conspiracy claim is hereby denied.

**Conclusion**

For the foregoing reasons, the Motion for Summary Judgment filed by GreenPoint is hereby GRANTED IN PART AND DENIED IN PART.

GreenPoint is entitled to summary judgment as to the TILA claim of Plaintiff, Leodonna Wick, only.

Summary Judgment is denied as to all other claims.

The extended discovery deadlines remain as requested by the Parties and set forth in this Court's Order dated January 25, 2017, as follows:  Non-Expert Discovery Deadline March 6, 2017; Plaintiffs' Expert Report Due April 6, 2017; Defendant's Expert Report Due May 4, 2017; Expert Discovery Deadline May 16, 2017.

A trial is hereby set for May 3, 2017 at 8:30 a.m.

IT IS SO ORDERED.

 Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED: February 10, 2017

-13-